Case No. 18-1282NL Kiewit Power Constructors Co. Petitioner v. Secretary of Labor, U.S. Department of Labor Mr. Gladner for the Petitioner, Secretary of Labor Mr. Sapper for the Respondent, Kiewit Power Constructors May it please the Court, the Commission's decision should be reversed for two reasons. First, the Commission's decision is arbitrary and capricious because it departed from its previous precedent without a reasoned explanation. Second, the Secretary's interpretation that he could apply the quick-drenching standard to construction employers without notice and comment rulemaking is reasonable and entitled to Chevron deference. Turning to my first reason, the Commission's decision should be reversed. That decision is arbitrary and capricious because it departed from its previous precedent without a reasoned explanation. Over 40 years, Commission precedent held that Section 6A standards were applicable in accordance with their terms to all employers and workplaces subject to the Occupational Safety and Health Act. The Commission departed from this precedent in ruling that Section 6A standards apply only to those industries already covered by the established Federal source standards. The Commission failed to acknowledge, let alone explain, this departure from precedent. The Commission didn't even address its leeway case or discuss its holding and inspection case. It discussed the Tenth Circuit's handling of leeway, right? Yes. Okay. But what we're arguing is that the Commission departed from its own precedent. But in each of the cases you cite, the Commission distinguished those cases. They weren't cases involving extending Walsh-Healy to new industries, right? No, we don't agree with that. But the main point here is that even if they were, the Commission precedent held that Section 6A standards were applicable to all employers and workplaces. So that's really the point here. The Commission never really addressed those holdings in the Bechtel and leeway freight cases. And we also think that the Commission's attempted distinctions were not valid. In the leeway case, for instance, there was a different industry to which the standard was applied, and that was the transportation industry. The original source standard, the Walsh-Healy Act, covered only manufacturing and supply operations. And in the other case, the Bechtel case, which is a case under the Construction Safety Act standard, again, the 6A standard was applied to a different industry. That was a construction management firm, which was different from construction. And the original source standard did not even cover construction management. It only covered construction subcontractors and employees. So those distinctions were not even valid. But the point is, the precedent in these cases was not addressed by the Commission, even though it had stood for over 40 years. Can I ask another question? It sounds like there's a lot of regulations that could rise or fall with this decision. That's correct, Your Honor. The Walsh-Healy ones. Are there Commission decisions? One, do you have a sense of how many other regulations would rise or fall? And two, are there Commission decisions that upholding those other regulations as applied to industry generally, that the Commission would be unraveling in this decision here if it were applied? Well, it's very difficult to estimate the number. We think at least dozens, maybe more. And the reason is that there were some rulemakings after these Section 6A standards were adopted in some of the industries concerned. Now, as far as – I'm not quite clear on what you're asking in the second question, that there would be some unraveling. Well, I'm trying to figure – if the argument that's made, if it's adopted here, it sounds like there's a lot of other identically situated Walsh-Healy regulations that are going to fall as well. That's true, Your Honor. And if there were Commission decisions upholding those other regulations as applied to industry generally, not confining them to the original sector of employment, then what they did here would seem to be in substantial tension with what they've done in those other areas. That's correct, Your Honor. But I hadn't seen any information about that in the briefs. Well, this case really is – this standard has not been challenged before, at least not as far as validity is concerned. And the precedent has basically stood for 40 years, 40-plus years, until this recent challenge and decision by the Commission invalidating it. It says that quick drenching is one of the most commonly cited violations in the construction area. Well, we don't have any information about that. There appear to have been numerous citations, but I can't tell you how the number of citations compares with those under other standards. Is it fair to say in the last 45 years or so there have been a lot? Yes. Have any of those been challenged and gone up to an ALJ or the Commission? None have been challenged as far as validity is concerned. There have been one or two that have been contested as far as the violation was concerned. Can I ask you if between 1971 and 1979, does the record show any citations for the quick drenching provision? I can't say off the top of my head whether there were any during that period. This question was addressed by one of the amicus briefs, Building Trades Union brief. It canvassed the number of citations of this standard. I'll check that. But there were very, very few actual ALJ cases. I think maybe two, but that brief addresses that issue. The second reason that I gave is that the Secretary's interpretation that he could apply the quick drenching standard to construction employers without notice and comment rulemaking is reasonable and entitled to Chevron deference. The Secretary's interpretation is consistent with Section A, which first expressly waived the notice and comment requirement and also adopted and extended established federal standards as OSHA standards to every employer, employee, and employment covered by the Occupational Safety and Health Act. The Secretary's interpretation is supported by a contemporaneous regulation, 29 CFR 1910.11a, which adopted and extended established federal standards to every employer, employee, and employment covered by the Act. The fact that that regulation was adopted at the same time saying almost exactly the same thing. Can you, under the Secretary's interpretation of 6A, can you give me an example of a regulation that would be unreasonable? What's the limit on the Secretary's interpretation of 6A? Well, what the Secretary cannot do is add more protective qualities to the standard or protective requirements to the standard in question. He can't extend the number of employers and employees to which these. Well, wait a second. You can't. I mean, but isn't that the argument that that's precisely what's happening here? No. That he's extending a type of protection that was crafted for one industry, but it doesn't really apply well to the new industry, and therefore it's in fact providing more protection than was originally planned. Isn't that precisely the argument? No. I'm making a different point here. Okay. What I'm saying is under this standard, employees are protected from exposure to injurious corrosive materials, and the nature of that protection is that the employer is required to provide a quick drenching facility that's within a reasonable distance that can be used in emergencies. Now, we can extend that requirement to industries to which it does not apply right now. What we cannot do, however, is to add additional protective requirements, such as the employees must also be provided with eye guards, which are not contemplated by the original standard. But there is no bar, in our view, to the number of employees who can actually be covered by the existing standard. As long as these are industries that are covered by the Occupational Safety and Health Act. Well, and as long as it doesn't decrease safety in the process. That's correct. That's in respect to the statute itself. Yes. That's an explicit statutory requirement. Now. And can I ask you, that's what you just said is supported by the language in C2, according to its terms. Yes. Right? Yes. Okay. So the Secretary's interpretation also advances Congress's goal of immediately expanding protections of established federal standards to as many employees as possible. Can I ask you one thing? The commission said here is that they didn't explain a change. I think it's invalid because the Secretary didn't explain the change in that short period of the summer of 71 to September of 72. Right. But the commission or the Secretary acknowledged that a change was being made in September of 71. Decided the authority for the change. That's right. Said why it was making the change. To be more consistent with the purpose of the statute and expanding the coverage of employees. That's correct. You're right. So is that a sufficient explanation, assuming that an explanation for the change was necessary? Well, we think it was sufficient, but we also think that the explanation was not, at least in terms of the formal explanation offered through notice and comment rulemaking, was not required for this change because of the two-year period that the statute waived the requirement of notice and comment rulemaking. But I think it's important to keep in mind here the circumstances under which this change was made. The revocation, and that's what it actually was, of standard 1910.5e or regulation 1910.5e, was a correction, and not a substantive change in interpretation as indicated by the circumstances. First, 1910.5e facially conflicted with the contemporaneous regulation 1910.11a, which I just cited. That's the one that's language is almost identical to that of the Secretary's interpretation of the section 6a. And 1910.11a extended the scope of the established federal standards to all industries covered by the Act. And the original version of this said the opposite. It limited the extent of its application just to the industries covered by the original source standard. And that was a mistake. And the fact that we corrected that mistake within three months is a strong indication that this was not a substantive change. It was just an attempt to make our regulations consistent. And the stated purpose of the revocation, as Your Honor pointed out, was to remove the limitation to the application of the standards, that they may apply to every employment and place of employment exposed to the hazards covered by the standards, which, again, was the very purpose of section 6a as we see it. And given that the Secretary continued to apply the corrected regulation for the next 49 years, the revocation was reasonable. This was not a case of the Secretary changing his mind, but of simply bringing his regulations into consistency. And as such, that revocation was reasonable. Can I ask one more time just to be clear? Do you have any sense of how many other regulations are in this exact same position? I can't quantify the number, but I think it's fair to say many. So as many a dozen, as many 20, as many 100? Probably at least two dozen. A dozen, okay. And quite possibly more than that. The Secretary also reasonably interpreted the legislative history as intending that he develop new construction standards in section 6a. I'm sorry, that he implement existing standards in section 6a. But the new standards to which opposing counsel refers and claims should have been adopted in accordance with notice and common rulemaking are really the province of section B, which does have that notice and common rulemaking requirement. What we were doing in section 6a was simply trying to implement as many of the existing established federal standards as possible to confer or to comply with Congress's mandate to provide a minimum floor of safety for employees, all employees covered by the OSH Act and all industries covered by the OSH Act, as quickly as possible. Don't the regulations, in the regulations, isn't there a suitability requirement that the Walsh-Healy Act, as applied to the construction industry or any industry, has to be suitable? Am I right about that? Is that a requirement of the regulations? I'm sorry, that the industry has to be suitable? Yes, suited to the industry. I'm not sure exactly what you're asking, that the wording of the standard be suitable to the industry? Yes. Isn't it a requirement that the standard that's going to be applied to the new industry has to be suitable to the industry? Or am I wrong about that? Well, I'm not sure exactly what you're asking, but it's certainly true that the standard has to apply according to its terms to the industry or the particular circumstances in question. And in this case, that application would be determined by whether the employees may be exposed to the hazard of exposure to injurious corrosive materials. So that would definitely be a requirement. There has to be that hazard for the standard to apply. I guess what I'm getting at is under the Secretary's view, is it required of the Secretary to adapt that particular standard to the particular circumstances of the industry? For example, in the manufacturing and supply industry, most of it's going to be indoors, right? You're going to have plumbing. You're going to have ready access to water. Construction industry is very different, right? You're going to be out of doors. You're not going to have easy access to water. Is there anything in the regulations or statute that requires the Secretary to take account of those differences when applying the standards to it? I don't think there's a formal requirement, but the Secretary does that sort of thing. And in particular, it's important to note that in this case, the Secretary determined practically 50 years ago that the quick drenching standard was one that applied at wide application, and certainly applied to the construction industry. And the Secretary informed construction employers throughout this period that this was one of the standards that was originally considered a general industry standard, but later was adopted as a construction standard, that applied to them. And the Secretary did this, among other things, by publishing a Federal Register notice back in 1979 called Identification, which specifically identified the quick drenching standard as one that would apply to construction employers. I thought there was a process variance or something where if an employer can't comply for whatever reasons by the nature of its operations, it can seek an exemption or something like that? That's right, or other means of providing comparable or equivalent protection. That's right. Has Kiewit ever sought? Not to our knowledge. Certainly not in this case. Have other construction companies that you're aware of generally sought or said they're not able to comply with the quick drenching standard? Again, not to my knowledge. This is an issue that is addressed, again, in one of the amicus briefs, the Building Trades Union brief, which points out that in addition to seeking a variant, an employer can also petition the Secretary for either revocation, amendment, modification of the standard. And Kiewit did not do so. I'm talking separate from that. A company could say, I don't know what other construction companies are doing, but because of where we do what we do or how we do it or whatever, we can't provide this type of protection. Yes, the company does have that right. It was not exercised. What I'm getting at is does compliance with the quick drenching standards look different in the construction industry than it does in manufacturing industry? There could be adaptations made depending on the nature of the industry. But as I was saying, I think construction doesn't count as one of those cases because not only because of so that wasn't done here, what you're saying, the standard that was established for manufacturing is the same one that's established now for the construction industry. No tailoring, no adaptation for the different natures of the workplace environment. There could be tailoring. But has there been? I believe the wording of the construction quick drenching standard is identical to that of the general industry quick drenching standard. So there wasn't such a modification. But as I pointed out, this is an area where OSHA has found repeatedly that the quick drenching standard applies to construction, that there is a need for it, that the employees have great exposure to materials, corrosive materials. I get that. I'm just asking the application of it, the enforcement. The application is the same.  It is the same. You have the same amount of water, the same distance from the workers. Everything's the same. Well, remember, we're just talking about the bare bones wording of the standard here. And the standard basically says that where the employees may be exposed to injurious, corrosive materials, the employer shall provide quick drenching facilities that can be accessed very easily in emergency situations. That's not to say that adaptations cannot be made. But as far as this particular application is concerned, the wording is the same. Now, Your Honors, I requested three minutes for rebuttal. I hope that's been preserved. All right. If there are no more questions, go ahead. Thank you. Mr. Saffer. Good morning, and may it please the Court, Your Honor. Arthur Saffer for Kiewit. Notice and comment rulemaking is a pale substitute for lawmaking by democratically elected representatives. Exceptions to it should therefore be rare, narrowly construed, and substantially justified. We don't have that here. We have an end run resting on nothing. Was your company in business in September 1971 when this was adopted? Kiewit Power Constructors was not in business at that time. Kiewit's been around since the late 1900s. Right. The parent company, Peter Kiewit, has been around for a long time. In construction? In construction, yes. And were they around in 1979? I'm sure Peter Kiewit was. I'm not sure about Kiewit Power Constructors, Your Honor. I think it was formed in the 80s, actually. Do you have any case where Congress has itself expressly said, notice and comment rulemaking does not apply for the two-year period here? I don't know of any other. Where courts have then said, we're going to construe that. We're not going to take Congress at its word. We disagree. We think there's a presumption against avoiding notice and comment rulemaking. You started out with this whole argument in favor of construing things narrowly, but I'm not sure. I think it applies when you've got ambiguous language, as opposed to when Congress has been as explicit as it was here. Well, the problem with that, Your Honor, is that 6A authorized OSHA, the Secretary, to adopt only established federal standards and then apply them not just to manufacturers with federal contracts, but to manufacturers in interstate commerce. So, right, what OSHA did here at first was just... It's clear Congress didn't say manufacturers. That's one of the questions in this case, is whether Congress meant for it to stay within the same sector or to employers generally. Yes, Your Honor. And as this Court said in simplex, the Secretary was not permitted to make substantive changes when he adopted the established federal standards. But that's what the Secretary did here. When you change the applicability of a standard from manufacturing to construction, even by the Secretary's own admissions in other rulemakings, you're making a substantive change. Was changing it from contractors to noncontractors a substantive change? No, it is not, because it is the exact same industry. It's manufacturing. Manufacturing with a federal contract is no different than manufacturing without a federal contract. And the Secretary has never said the contrary, and the Secretary can't, because the legislative history, as shown in the Senate report, and the House report, too, by the way, shows that Congress saw that Congress saw exactly that, that if you have manufacturing with a federal contract, it's no different than manufacturing without one. So the safety concerns and everything are going to be the same. Exactly. The operations are going to be the same. Exactly. But if you change from manufacturing to construction, that is a substantive change within the meaning of this Court's precedent and simplex time recorder. Right. But then in Section 6A, so given that you've said moving from contracting to noncontracting doesn't change anything, safety concerns are going to be the same, operations are going to be the same, it's not going to. Right. It's just going to be a very smooth transition. Correct. That was the Congressional intent, Your Honor. Congress said in 6A that they should establish federal standards as health and safety standards unless the Secretary determines that the promulgation would not result in improved safety or health. Now how, if all they were allowed to do was stay in the same sector, where you've said everything is the same, would there ever be a situation where the Secretary would determine that extending it from within that exact same industry would not improve health or safety? You might have a very poorly written standard. I don't understand what you're talking about. You just said that what Congress allowed the Secretary to do was to take a standard, here we'll talk about one that applied to contractors, and it could extend it to people who are in the same industries, manufacturing. Correct. Even if they weren't covered by the original standard. Correct. And it could do that because the problems are going to be the same, the operations of industry are going to be the same, the need for safety is going to be the same. Correct. But Congress was quite explicit that when it said the Secretary will adopt these federal standards as national health and safety standards, that there are going to be situations where, in doing so, it would not increase safety or health. And that couldn't be if they stay in the same industry, given what you've just told me. It had to be that they were crossing some sort of more significant line. Two points on that, Your Honor, if I may, please. First of all, 6A covers also national consensus standards. And although it's not in the record, it is stated everywhere in law review articles from 1971 onward, national consensus standards were very poorly written. And a lot of them, shall we say, should never have been adopted. Point number two, that clause authorizes OSHA only to not adopt a provision. It does not authorize OSHA to change it. I'm not talking about that. I'm just talking about what Congress would have, why it would have thought, if it thought all it was going to do was keep everything in the same sector, why it would have thought there would be concerns that that movement, that's, I think in your mind, sort of a smaller, more moderate movement, would ever have a situation where it wouldn't increase health or safety to do that. It had to think that they were going more broadly. I think it's pretty clear that what Congress had in mind there was the national consensus standards. You think it's clear, or that's just your understanding of the language? The established federal standards went through notice and comment rulemaking for application to their industry. The national consensus standards were written by private persons, safety experts mostly, who were not expert at drafting anything. They were old Joes who just drafted up private standards, and they were filled with provisions that later turned out to be nightmares. I'm just talking about the text of it. I get that. That's important background. And that is probably what Congress was thinking of. Plain text of the statute, though. Because there were lots of, exactly, but the statute authorized OSHA, commanded OSHA in fact, to adopt not just established federal standards, like the Moore-Shealy standards, but also national consensus standards, like, for example, ANSI standards, or National Fire Protection Association standards, which were not well-drafted, and everyone knew it. Mr. Zapper, I don't see anywhere in the statute that it makes clear the argument that you're making, which is that the Secretary cannot apply these, any established federal standard to a new sector. And as I understand the burden of your argument right now, you have to show that it's unreasonable for the Secretary to have the view that he has. Not just that you have the better reading of the statute. We're in Chevron Step 2 land, and you have to show that the Secretary was somehow unreasonable to not read into the statute the language you're reading into it now. How do we get there? Because the language you're giving us is not in the statute. It's not there. Because it's not the standard. It's not the established federal standard. The established federal standards apply to manufacturing. It doesn't say that, though. Let's just start here. It doesn't say any established federal standard for that sector, right? It doesn't say that. Section 3-8 of the Act, which is quoted in our brief and is relied on quite expressly on this exact point. Section 3-8, which the Supreme Court has held must be applied in these kinds of cases. This is the definition of occupational safety. Correct. Yes. It says that a standard is a standard that's reasonably necessary or appropriate in employment and places of employment. Now, the only employment and the only places of employment that the established federal standards were adopted for, in the case of the Walsh-Healy, was manufacturing. No. For contracting and manufacturing. For contractor manufacturing. For contracted manufacturing. But OSHA has never said, and the entire premise of the legislative history, and I would encourage Your Honors to read the Senate Committee Report on this point, the entire point was that Congress thought that there was no substantive difference between manufacturing with and without a federal contract. So the established federal standards... I think you would agree that under the... I think Judge Griffith was talking about the plain statutory language, and at least under this plain statutory language, if we haven't yet looked at the legislative history, it doesn't have that narrow reading. I get that you have an argument about legislative history... Before you get to legislative history... But I'm just asking about the statute itself. It's not clear. It says it's places of employment, but it's also healthful employment, which is not so narrow. Yes, but it's talking about employment and places of employment, and the employment and places of employment here are different from manufacturing or federally contracted manufacturing, if Your Honor will. But construction is still employment. What? I'm sorry? Construction is a form of employment. Oh, but it's not the same employment. That's the point. Where does it say same? In the statute? Well... That's the problem. It doesn't say it in the statute, and you have to convince us that it's unreasonable... Okay. ...to reject that. If the word employment means any place, then it has no function in this provision. Then you're making it into something... No, it's not any place of employment. I mean, all these standards apply to places of employment of some sort or another, but they were not judged to be, quote, reasonably necessary or appropriate in every place of employment. That's the problem for OSHA here. If you look at the words of the statute, for example, as this court said in the steelworkers case, it judged the construction led... I'm sorry. It judged the led standard appropriate for certain employments, not for other employments, which happened to be construction, by the way. So if OSHA is allowed to draw a distinction between employments, the same distinction applies under Section 3A. In fact, it is the same distinction. That's what OSHA applies when it decides, as it did in the led standard case decided by your honors, that a standard is appropriate in one kind of employment, but not in another. And that's what OSHA has been doing literally for decades. When it applied, for example, the lockout standard to manufacturing... So you said OSHA made those decisions? I'm sorry. You said OSHA made those decisions to apply it in one place versus another? Yes, all the time. And they were reasonable judgments there to make those distinctions? I don't know if they were reasonable, but they were lawful. In other words, they were drawing distinctions between construction and non-construction, between maritime and non-maritime. They were deciding that the lockout standard should not apply to construction. The confined space standard should not apply. So you think the statute forbids them from ever deciding that some standard actually applies just as well to construction as to non-construction? They can do that if they make the findings. They have to find that it's feasible. They have to find it's reasonably necessary or appropriate. They have to find that there's a significant risk in all the industries. They have to find it's feasible in all the industries. Did they have to do that in the first two years as well under the statute? That's your view? They weren't required to, Your Honor, because Congress believed that if you apply a construction standard, for example, under the Construction Safety Act, from construction with a federal contract to construction without, you're not making a substantive change. That was the whole point. That was why Congress authorized this in the first place. I just want to clarify one thing, too. So your argument is, are you making an argument that under Chevron's step one, that the statute itself didn't allow the secretary to extend the quick drenching rule beyond the manufacturing and service industries that were covered in the contracting context under Walsh-Feeley Act, or are you making an argument that, you're right, the statutory language isn't crystal clear, but their decision was unreasonable? It seemed back and forth sometimes in your brief. I want to make sure I understand exactly what your position is. Number one, step one of Chevron applies here. The secretary's actions were contrary to the definition of an OSH standard in Section 3A. Number two, if there's any ambiguity, the ambiguity is dispelled as the commission found by the legislative history, which is crystal clear. I might also argue that Chevron does not apply here, because under Encino Motor Car, the change was never explained. Now, it is true that the secretary said, well, gee, we'd like to expand the applicability of it, but they never explained why. Hang on, hang on. So Encino Motor Car is pretty clear. First of all, it's contextual, how much explanation is necessary. So in this case, you had, they acknowledged the change. They acknowledged the change. They cited the source of authority for making the change, and said why they were making the change, because this is more protective and consistent with congressional intent. Why, in the context in that first two-year period, where it's supposed to go fast, in that context, particularly where there's no reliance interest, because the old standard had only been in effect for two weeks, when they made the change. Why is that not sufficient under Encino Motor? Or do you have, what's your best case that that is not a sufficient explanation for the change? Well, I don't know if there's a post-Encino case that would be closest to this. Even a pre-Encino one. But they never explained the change. They explained what they were trying to accomplish, but they never explained why they made the change, why they changed their mind. Several months before, they thought that all these Walsh-Healy manufacturing standards had to apply only to manufacturing. Three months later, they said, oh, no, they can apply to the world. Construction, underwater construction, I had a case involving underwater construction. And the crane standard there was strange. It applied to underwater construction, according to OSHA, but I found out it was originally a Walsh-Healy standard. Very strange. So they never explained why they made that change. Yes, they explained what they were trying to accomplish, apply it to the universe, but they never explained why they changed their mind. And that's what Encino Motor Car requires. If I may, also on Chevron, Your Honor, this doesn't even meet MEED. MEED requires some formality of some sort before you make a substitute change to a regulation. They didn't have any formality. This was by fiat. Your position is MEED applied during what, I know this case wasn't around then, but the principle in MEED applies to what the Secretary did in that first two-year period? Yes, because we're talking about whether or not today court should give Chevron deference to something that applied then. If you're going to look then, you should apply the standards to see if you should defer under Chevron. It doesn't meet MEED. So to be clear then, your position would be that there would be no Chevron deference for anything that was adopted in those first two years when they didn't go through formal notice and comment under what you just said, because all of those will have the MEED issue, as I understand, unless there's something different here. I would say the answer to your question is that's correct, but Your Honors don't need to go that far here. Well, you have to have a reason for making a distinction. Do you have a reason for making a distinction? Because all Your Honors have here is just a fiat, just presto, they now apply beyond what we originally said they apply. That is much different from what OSHA did when OSHA adopted substantive scope provisions in May 1971. Now they abolished a scope provision, a substantive scope provision. That's very different. There are other reasons why Chevron doesn't apply here. Chevron does not apply when you're limiting the APA. Well, you're limiting the APA in this kind of a case. This is not a Chevron case, Your Honor. This is a case where OSHA needs to show its authority to do what it did. And the one thing it cannot show is that it had any authority to change something. By the way, this court said in simplex time recorder that OSHA had to not make substantive changes. That's the principle that applies here. OSHA cannot credibly say it didn't make a substantive change. Its own rulemaking documents in other rulemakings say that this is a substantive change, so therefore it's illegal. Do you have any more questions? Okay. Your time is up. I understand my time is up. Thank you, Your Honors. All right. Does Mr. Glavine have any more time? All right. Why don't you take two minutes? Thank you, Your Honor. I'd like to start by addressing a question that Judge Griffith asked in my first argument. And he asked me whether any requirement was necessary for suitability of a standard. And I want to point out here that the review commission provides, in every case, for the possibility of an affirmative defense of infeasibility. And if the employer thinks that the standard is not suitable for his industry or his particular company, he always has the option of making that defense. In addition, as I pointed out in my first argument, he can petition the secretary for modification, revision, or revocation of the standard, in addition to having the right to requesting a variance, to use some other requirement to satisfy the standard. Can he do that before the citation, or is it an affirmative defense once he's cited? The infeasibility is an affirmative defense. All right. But the variance has to be requested before the citation. Now, my opposing counsel made the argument that the secretary is not permitted to make a substantive change. That really begs the question of what a substantive change is. And as I explained in my earlier argument, what the secretary is allowed to do is to extend the application of the standard, but he cannot impose a greater compliance obligation. And as I explained in my first argument, that means, for instance, with the quick drenching standard, the secretary cannot add, for instance, a requirement of wearing eye guards that wasn't found in the original source standard. But what he can do is to extend the application of that standard to industries that weren't covered before. Opposing counsel also makes the argument that formality, administrative formality, is required under the Mead case. I'd like to point out that that's not an accurate description of the case. Mead does not make administrative formality, namely notice and comment rulemaking, an absolute prerequisite of Chevron deference. And that's pointed out in the Mead case of 533 U.S. of 230 to 31. If the revocation in our case was merely a clarification or a correction of an existing position and not a substantive change, as we argue, then no administrative formality was required and Chevron deference would not be barred. Finally, we don't agree with opposing counsel's interpretation of simplex time recorder. That case did not bar the type of change we made here, but only prohibited a change in the actual protection of the source standard. And that is not at all inconsistent with what our interpretation here says. For these reasons, we ask the Court to reverse the commission's decision to reinstate the citation and to rename the case to the commission for decision of the merits of the citation. Thank you.
judges: Henderson, Griffith, Millett